William Hauser v. Commissioner.
Hauser v. Commissioner
Docket No. 69206.
United States Tax Court
T.C. Memo 1960-162; 1960 Tax Ct. Memo LEXIS 127; 19 T.C.M. (CCH) 852; T.C.M. (RIA) 60162; August 5, 1960
*127 J. Sterling Halstead, Esq., for the petitioner. Herbert Rothenberg, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Petitioner contests the determination of deficiencies in income tax and claims overpayments as follows: Claimed Over-
Year
Deficiency
payment
1953
$119.20
$ 775.56
1954
73.55
337.40
1955
24.44
$217.19
$1,112.96 The sole issues are whether petitioner is entitled to the deduction as a bad debt of $16,662.96 in the year 1955; and whether, if so, this is a business or a nonbusiness bad debt. The years 1953 and 1954 are involved only because of a claimed net loss carryback. Some of the facts were stipulated. Findings of Fact The stipulated facts are hereby found. Petitioner is an individual residing at 349 East 49th Street, New York 36, New York. He filed his individual tax returns for the years 1953, 1954 and 1955 with the district director of internal revenue, 484 Lexington Avenue, New York 17, New York. Under date of May 29, 1956, the petitioner filed claims for refund for the years 1953 and 1954 with the district director of internal revenue, 484 Lexington Avenue, New *128 York 17, New York. Prior to June 30, 1941, petitioner was engaged in the wholesale diamond business with his brother Leo. This business was conducted as a partnership. Max Hauser, another brother of petitioner (hereinafter referred to as Max), was employed by the partnership and drew a salary of approximately $50 or $60 per week. Prior to 1941 Max, who was 41 years of age as of 1941, lived with petitioner. Petitioner paid all expenses for maintaining their joint household. As of June 30, 1941, the partnership of Leo and petitioner was dissolved. As of June 30, 1941, petitioner and Max entered into a new partnership as wholesalers of diamonds under the firm name of William and Max Hauser. Paragraphs 5 and 6 of the partnership agreement provided as follows: "5. The capital of the partnership on the date hereof consists of merchandise and money of the value of Thirty-Six Thousand One Hundred Thirty-six Dollars and Sixty-one ($36,136.61) Cents, of which the interest of the respective parties is as follows: William Hauser
$19,171.94
Max Hauser
16,964.67
"6. Net profits and losses shall be shared equally." Max's capital investment of $16,964.67 was actually *129 contributed by petitioner. Max was "supposed" to pay him back. No notes were given for the alleged loan, it was not interest bearing, nor was a due date set for any repayment. The alleged loan was eventually to be paid for as the business went on and provided there was a profit to pay petitioner. The sum in question was never repaid. Petitioner and Max did not draw specified salaries from the business nor were there any negotiations as to withdrawals. Each drew whatever funds he needed for personal living expenses. Max's drawings were far in excess of those of petitioner. Petitioner discussed the overdrafts with Max from time to time and Max promised to draw less in the future. The amount of any specific drawing was not questioned by the other brother. The following schedule reflects the credit (or debit) balance in Max's capital account as per the partnership's books and records: Capital
Credits
Debits
Account
Other
Balance
Profits
Credits
Drawings
Capital contributed
$15,840.79 *
Period Ended Dec. 31: 1941
16,244.41
$ 7,490.84
$1,500.00
$ 8,587.22
1942
14,275.92
5,747.28
1,500.00
9,215.77
1943
15,132.44
7,565.51
1,500.00
8,208.99
1944
13,792.06
7,422.84
1,500.00
10,263.22
1945
17,988.76
11,885.73
2,500.00
10,189.03
1946
7,784.91
4,108.77
2,000.00
16,312.62
1947
3,202.84
2,807.20
3,243.06
10,632.33
1948
( 2,811.46)
3,049.01
652.92
9,716.23
1949
( 6,763.35)
850.11
2,330.35
7,132.35
1950
(10,788.40)
2,699.43
803.75
7,528.23
1951
(10,246.80)
3,806.57
4,990.72
8,255.69
1952
(11,011.03)
5,889.05
1,033.90
7,687.18
1953
(12,638.96)
5,248.31
1,729.43
8,605.67
1954
(14,706.51)
3,481.78
934.75
6,484.08
*130 Max Hauser died on January 13, 1955. After Max's death the partnership books and records reflected that additional drawings in the amount of $1,956.45 were made against the account of Max. These drawings were for personal expenses of Max and his estate. The partnership from its inception, June 30, 1941, until its dissolution as of December 31, 1954, operated at a profit for each year. The following schedule reflects the partnership profits for the period indicated expressed in terms of the nearest $100; Partnership
Year
Profits
1942
$11,500
1943
15,100
1944
14,800
1945
23,800
1946
8,200
1947
5,600
1948
6,100
1949
1,700
1950
5,400
1951
7,600
1952
11,800
1953
10,500
1954
7,000
Petitioner supported his brother, Abraham Hauser, prior to his death. Petitioner also supported his sister, Regina Herzog. Petitioner at all times was completely familiar with Max's personal financial condition. Max's sole source of income was his drawings from the partnership, which were used to cover personal living expenses. Petitioner also knew that the only assets *131 owned by Max were: (a) A home in Rockville Centre, New York, equity at date of death, $10,520.27, title to which was in the name of Max and his wife, Irma Hauser, as tenants by the entirety; and (b) Certain shares of stock purchased by the partnership and a savings account, title to which were in the name of petitioner and Max Hauser as joint tenants with right of survivorship, the total date-of-death value of all of said property being $2,344.25. Under date of March 21, 1942, a $10,000 life insurance policy was purchased wherein Max was the insured and petitioner was named as the beneficiary. The policy contained a double indemnity clause in case of accidental death. The premiums for the policy were paid for by partnership checks, and Max's drawing account was debited for the premium payments. After Max's death on January 13, 1955, petitioner collected $19,603.53 under the double indemnity clause of the policy. Petitioner then made a gift of $3,000 of the proceeds to Irma, and a gift of $1,500 of the proceeds to Joan Wallack, the respective widow and stepdaughter of Max. In petitioner's 1955 individual income tax return, Schedule of Other Business Expenses, appended to Schedule *132 C, Profit (Or Loss) From Business Or Profession, he claimed a deduction in the amount of $16,662.96 as "Deficit in partners capital account in the dissolved partnership of William and Max Hauser - Uncollectible from decedent's estate." In the claims for refund for the years 1953 and 1954, referred to above, William claimed a net operating loss carryback from 1955 based upon the alleged business bad debt created by his brother's excessive withdrawals. Max's excess drawing account on the partnership books of Max and William Hauser, and the amounts subsequently charged thereto, do not constitute bona fide loans. Opinion Petitioner's claim of a deduction for a bad debt must be denied for at least two reasons. In the first place, it is evident that there was no unconditional obligation on the part of the debtor to repay. Even the debtor's original capital account on the partnership books was advanced by petitioner and was to be repaid, according to petitioner's own testimony, only if the business generated sufficient profits. By the time this account had been reduced to less than nothing, it is a fair inference that the additional debits to the account would likewise be due only *133 in the event of business profits so large that they would surpass the debtor's continuing overdrafts. At least nothing is shown to the contrary. The lack of any note or tangible evidence of any loan, of any security, of any specific due date and of any provision for interest, coupled with the relationship between petitioner and the debtor, lead irresistibly to the conclusion from the record as a whole that the overdrafts were more like gifts, and certainly not true loans. , affirmed per curiam (C.A. 2) ; see . For similar reasons, we conclude that if an obligation to repay was contemplated, it was worthless when acquired. At least beginning in 1948, when the debits to the debtor's account began to accumulate, it must have been evident that neither property nor earning power existed out of which an ordinary prudent creditor could expect repayment. ; . If the debt, such as it was, was uncollectible in 1955, it has not been shown that it was not equally so for many years *134 before. And the debtor's death, under the present circumstances, was not, in our view, any "identifiable event" which transformed for the first time a collectible obligation into a bad debt. These conclusions make it unnecessary to explore the additional consideration that petitioner, having been made whole by the collection of insurance on the debtor's life, which in this instance respondent makes no attempt to include in petitioner's income, ; cf. , revd. (C.A. 6) , is, at the same time, attempting to deduct as a bad debt the premiums which created and kept alive the policy. As our findings show, these payments were made out of partnership funds, charged to the debtor's account, and form part, if not, as far as we know, all, of the net debits thereto. If considered a legitimate business expense [1] it is conceivable that these might have been deducted by the partnership from year to year as they were paid. See , affd. (C.A. 4) . But no such claim has apparently been made and if it were it would *135 be difficult to reconcile with the existence of a debt to the partnership from the insured. Nor, for similar reasons, need we explore the possibility that, under the law of the jurisdiction, the insurance might have been accessible to creditors so as to negate the assumption that the debtor's estate was totally without assets and the debt entirely worthless. See ; . It is sufficient that, for the reasons first stated, the existence of a bad debt in the year in controversy has not been shown. Decision will be entered for the respondent. Footnotes
*. This amount is $1,123.88 less than the amount stated in the partnership agreement.↩
1. Petitioner claims that the entire debit balance in the debtor-partner's account was a business bad debt.↩